## TRAVIS and others *vs.* THOMPSON.

The lien of a carrier, for back freight paid by him to another carrier, is not measured by the quantity of goods represented, nor the sum advanced by him. It exists only for the quantity of goods actually transported, whatever the same may be, and for the customary and reasonable rates of transportation.

Where an intermediate or ultimate carrier pays a previous carrier the amount claimed by him for back freight, without knowledge of a payment having been made by the consignor, to the original carrier, on account of the freight, at the commencement of the voyage, he cannot recover of the *consignee* the amount of such previous payment.

Though intermediate or ultimate carriers have by custom and by the law the right to collect the charges of previous carriers, properly incurred in the actual transportation of the goods, if reasonable in amount and actually unpaid, yet if such previous charges have been in fact prepaid, the intermediate or ultimate carriers cannot assert a lien therefor

APPEAL by the plaintiffs from a judgment entered on the report of a referee. The action was brought to recover a claimed balance of freight, for transportation of lumber from Montreal to Troy, alleged to be about 137,000 feet, and found by the referee to be 126,357 feet. J. A. Perkins, of Montreal, was the owner and consignor of the lumber, and the defendant the consignee. Perkins made a special contract with Clemons, Jones & Co. to forward the lumber from Canada to Troy, at $5.50 per thousand feet, and advanced them $100 upon the freight. Clemons, Jones & Co., who were shippers at Montreal, sent on the lumber to the plaintiffs, who were forwarders at Whitehall. The plaintiffs, ac-

Travis *v.* Thompson.

cording to business usage, paid $548 back freight to Clemons, Jones & Co., being at the rate of $4 per thousand feet, receiving the same in good faith, and ignorant that any thing had been paid thereon, and engaged with Clemons, Jones & Co. to transport the lumber from Whitehall to Troy at $1.50 per thousand, amounting at the same estimate to $205.50. They sent on the lumber to the defendant, at Troy, under said special agreement with Clemons, Jones & Co. as to the amount of charges. After the delivery of the first boat load of the lumber, and before more was delivered, one of the plaintiffs called upon the defendant in regard to the freight. The defendant then claimed the payment of $100 made by Perkins to Clemons, Jones & Co., having been informed thereof by letter from the consignor. The plaintiffs declined to allow it, and refused to deliver any further, except upon the promise by the defendant to pay the plaintiffs the full bill without abatement of the $100 previously paid to Clemons, Jones & Co. Some negotiation then took place between the parties, resulting, as the plaintiffs claimed, in the making of such promise, and, as the defendant claimed and as the referee found, in a consent by the defendant, that the lumber be delivered without prejudice to the plaintiffs' claim. Thereupon the lumber was delivered, and this is an action mainly to test the right of the plaintiffs to recover that part of the back freight advanced by them to Clemons, Jones & Co., which was paid to the latter by the consignor at the time of the contract of affreightment; but also to recover an additional balance claimed to be due, over and above all payments. The lumber was inspected and measured at Troy, as delivered from the boats. By Troy inspection it measured 126,357 feet. The plaintiffs paid Clemons, Jones & Co. as for 137,000 feet. It did not appear how that measurement was obtained, nor whether the lumber was measured, on shipment. It was shown that Canada measurement overrun Troy inspection, from the usage at the latter place to discard fractions of feet. The lumber was, however, deliv-

ered under Troy inspection, and sold by that measurement. The referee found the quantity to be 126,357 feet. Whether the difference arose from the different modes of measurement, or how, did not appear. The referee further found that the freight, at $5.50 per thousand, came to $694.96, and that (in addition to the contested item of $100) the defendant paid to the plaintiffs $600 on account of the freight. The referee reported in favor of the defendant; holding that he was entitled to retain the $100. And judgment was thereupon entered for the defendant. The plaintiffs appealed to the general term.

*J. Romeyn,* for the appellants.

*W. A. Beach,* for the respondent.

Hogeboom, J. The plaintiffs raise four points, on which they rely for a reversal of the judgment. 1. That the quantity of lumber transported was greater than that which was allowed by the referee. 2. That the defendant promised unconditionally to pay the $100, which the referee refused to allow. 3. That as a matter of legal right the plaintiffs were entitled to the $100 advanced by them to Clemons, Jones & Co. 4. That, at all events, the report of the referee is far too small an amount.

The first, second and fourth propositions are questions of fact, and may appropriately be first considered.

I. As to the quantity of lumber actually transported. (1.) There was no clear and distinct evidence that the lumber was ever measured in Canada; or that such measurement amounted to the figures claimed by the plaintiffs, or mentioned in the bill presented by Clemons, Jones & Co. to the plaintiffs and paid by them. (2.) There was proof of the quantity according to the Troy measurement. This was the measurement claimed by the defendant and adopted by the referee. It rejected the odd inches, but there is no proof

that this was not the general custom; nor that it was not proper; nor that the discrepancy arose in that way. There is proof that the defendant *sold* as well as bought by that mode of measurement, and sufficient to infer that such was the custom at the place of delivery. (3.) The referee has found, as a matter of fact, what the quantity of lumber was; and the evidence is not so preponderating the other way as to justify us in setting aside his report as against the weight of evidence.

II. The same considerations apply as to the promise to pay the $100 upon the delivery of the lumber. The plaintiffs claim there was such a promise; the defendant denies it, and claims there was no promise other than that the delivery of the lumber should not prejudice the plaintiffs' claim for the $100. There was proof on both sides of this question; perhaps slightly preponderating, as to number of witnesses, on the part of the plaintiffs. Against this is urged the extreme improbability that the defendant would have made such a promise, against the express instructions of his principal. The evidence being thus balanced, the referee has found the fact in accordance with the defendant's version of the transaction, and I think his finding cannot be disturbed.

III. The plaintiffs claim that, at all events, there was a balance due them, for which the referee should have reported in their favor. That depends entirely on the measurement adopted. If we adopt the Troy measurement, and assume that Clemons, Jones & Co. brought no more lumber to Whitehall than the plaintiffs received there and transported to and delivered at Troy, then the plaintiffs have been fully paid, if they are not entitled to the $100. On the other hand, if we adopt the (alleged) Canada measurement, or the quantity supposed by the plaintiffs to be the correct quantity, then there will be a balance still due the plaintiffs. The question comes back to one of quantity, and that has been decided by the referee against the plaintiffs; unless indeed we take the position that the plaintiffs had a right to assume as correct

the quantity represented to them by Clemons, Jones & Co. however extravagant or incorrect, pay their charges however exorbitant, and then have a clear right to hold their lien for the sum so advanced, however exaggerated may have been the quantity, or however oppressive the price of transportation. I apprehend the true rule is, that the lien exists only for the quantity actually transported, whatever the same may be, and for the customary and reasonable rates of transportation. Any other rate would put the consignee at the mere mercy of the carrier.

IV. The remaining question—in regard to the $100—is the important question in the case; and it is this: Clemons, Jones & Co. having agreed with the consignor and owner of the goods to transport the goods from Montreal to Troy for a stipulated compensation—$5.50 per 1000 feet—and having been paid in advance $100 upon the price of transportation, and having employed the plaintiffs at Whitehall, when the lumber arrived, to transport the lumber the residue of the way to Troy at a stipulated compensation, $1.50 per thousand feet, and not having informed the plaintiffs of the advance of $100, and the latter having paid the full freight ($4 per thousand) to Clemons, Jones & Co. for the transportation of the lumber from Montreal to Whitehall, in good faith and without knowledge of any payment having been made thereon, and having transported the lumber from Whitehall to Troy and received the stipulated price for the same, and also the whole of the charges of Clemons, Jones & Co. for transporting from Montreal to Whitehall at $4 per thousand, except the $100 originally advanced by the owner of the goods, is that $100 recoverable by the common carrier against the consignee? In other words, who takes the risk of a part payment of the price of transportation at the commencement of the voyage, not known to the intermediate or ultimate common carrier who makes the final delivery of the goods. 1. The contract made between Perkins, the owner, and Clemons, Jones & Co. was a lawful one, and

Travis *v.* Thompson.

obligatory upon the parties. Any payments made must of course, upon a final adjustment, be allowed. 2. We are not furnished with the bill of lading. That ought to have been produced, and ought to have contained a memorandum of the payment which had been made. The fact of its not having such a memorandum, would be a circumstance, perhaps, of some suspicion; but the bill of lading was not produced. 3. Clemons, Jones & Co., by virtue of the contract, of course went into the possession of the goods and had lawful possession, with the consent of the owner. 4. This circumstance invested them with an apparent authority over the goods, probably sufficiently so to authorize them to employ another carrier to forward the goods to the place of destination, and to vest the latter with a lien thereon for the price of transportation, if such was the custom and course of business. 5. The plaintiffs, therefore, came into possession of the lumber under a lawful authority, and had a right to transport the same to Troy, and I incline to think, so far as their own labor and services were concerned, to charge the ordinary rates of transportation for such labor and services, and to assert a lien therefor. 6. They had also, by custom and by the law, the right to collect the charges of previous carriers properly incurred in the actual transportation of the goods, at least with the qualification that they were reasonable in amount and actually unpaid. 7. But if such previous charges had been in fact prepaid, can the ultimate carrier assert a lien for such charges? (1.) It does not seem equitable that the owner or consignee should be obliged to pay them a second time, having actually paid them once; unless there was some negligence or bad faith on their part. I discover no evidence warranting such an imputation, unless it be the omission to state such fact of prepayment in the bill of lading. But as we are not put in possession of the bill of lading, it may be that in fact there was no such omission. (2.) The plaintiffs might have protected themselves against this payment.

They were bound, I think, in common prudence, to inquire whether the previous freight had been paid; or to confine their remedy to their own principals, who had deceived them. (3.) Perhaps the case would have been altered if they had made all proper inquiries and such inquiries had turned out to be fruitless; or if they had consulted the bill of lading and found there no mention of the prepayment; but they appear not to have taken any of these precautions. (4.) As to the freight *earned by themselves*, it may be they were *independent* freighters, and entitled to enforce their lien against the goods, even though the *whole* freight had been prepaid at Montreal. And this upon the ground that the custom of the country and the course of business authorized the employment of independent lines of carriers in the transmission of freight. But upon this point I express no positive opinion. (5.) But as to the freight earned by their predecessors, Clemons, Jones & Co., they performed no service, were bound I think to inquire—were not *obliged* as carriers to receive the cargo charged with the burthen of the previous charges, and may be regarded as the mere *agents* of Clemons, Jones & Co. to collect their lawful charges.

The modern authorities favor the rule contended for on the part of the defendant. In *Van Buskirk* v. *Purinton*, (2 *Hall's N. Y. Rep.* 561,) certain goods were sold by the plaintiff on a condition with which the buyer failed to comply, and he shipped the goods on board the vessel of the defendants. The defendants, on demand of the goods by the plaintiff, refused to deliver. The plaintiff brought trover and recovered the value of the goods, although the defendants insisted on their lien for freight. In *Coleman* v. *Collins* (2 *Hall's N. Y. Rep.* 569) the same doctrine was maintained. In *Fish and others* v. *Newberry*, (1 *Doug. Mich. Rep.* 1,) the plaintiffs shipped goods on Lake Champlain, consigned to parties in Michigan, and paid the freight in advance to common carriers at the place of shipment. During the transit of the goods they came into the possession of other common carriers, and ulti-

mately into the hands of the defendants, warehousemen at Buffalo, as consignees of said last named carriers. The defendants being warehousemen and forwarders, received the goods and advanced the freight from Troy to Detroit. On demand of the goods at the latter place by the plaintiffs, the defendants refused to deliver, unless their advances for freight and other charges for storage were paid, claiming a lien therefor. The plaintiffs refused to pay the same, and brought replevin for the goods, and the action was sustained; the court holding that the plaintiffs were entitled to the possession of the goods, without payment of the freight and charges, and that the defendants had no lien therefor. (See also Angell on Carriers, §§ 363 to 366.)

In Robinson v. Baker, (5 Cush. 137,) and Stevens v. The Boston and Worcester Rail Road Co., (8 Gray, 262,) it was held that the carrier is not under an absolute obligation to convey, at all events, without inquiring into the title or authority of the party from whom he receives the goods; that he is not obliged to receive them from, nor transport them for, a wrongdoer; that he is bound to make investigation into the title or authority of the shipper or consignor of the goods; that he cannot assert and enforce his lien for carriage, or for the previous charges of a former carrier, except he receive the goods from a party having proper authority to deliver them to him for transportation; that this rule is not onerous on the carrier, inasmuch as he can always protect himself against fraud or imposition by demanding prepayment of the price of transportation.

The judgment entered on the report of the referee must be affirmed.

PECKHAM, J. concurred in the result of the foregoing opinion.

GOULD, J. There being no bill of lading produced, the plaintiffs are liable to the defense claimed, on the facts

proved. Had the bill of lading been shown, *without* any note of the $100 paid, I think the plaintiffs would be entitled to recover all they claim.

Judgment affirmed.

[ALBANY GENERAL TERM, March 3, 1862. *Gould, Hogeboom* and *Peckham*, Justices.]